UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )        No. 3:07-CR-113
v.                             )        (JORDAN /GUYTON)
                               )
DANIEL GLENN HAMPTON,          )
                               )
              Defendant.       )

## <u>REPORT AND RECOMMENDATION</u>

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This action came before the Court on February 7, 2008, for an evidentiary hearing on defendant Daniel Glen Hampton's ["Defendant's"] Motion to Suppress Evidence, as amended, [Docs. 67, 91], and Motion to Suppress Fruits of Wiretaps.[1] [Doc. 61] Assistant United States Attorney Hugh Ward was present representing the government. Attorney Jonathan Moffatt was present representing Defendant, who was also present. The two central issues before the Court are: (1) whether the District Court ordered "unnecessary" wiretaps of Defendant; and (2) whether a "warrantless search" of Defendant's home, along with statements made by Defendant, were illegally obtained. At the conclusion of the hearing the Court took the matters under advisement, and the matters are now ripe for adjudication.

---

[1]The Court notes that defendant Emory Saylor recently adopted the Motion to Suppress Fruits of Wiretaps. [Doc. 110]

# I. SUMMARY OF TESTIMONY

## A. Testimony of Chris Hall

The government called as its first witness Chris Hall ("Detective Hall"), a major crimes detective with the Rhea County Sheriff's Department ("RCSD"). Detective Hall testified that he has been with the RCSD for approximately thirteen years. Detective Hall stated that he was on duty on the morning of August 18, 2007, and that on that day he was notified to proceed to a residence ("the Residence") on Roddy Road to investigate a possible shooting. Detective Hall testified that he arrived at the Residence around midmorning, and that he believed that Defendant reported the shooting to 911.

Detective Hall testified that he traveled to the Residence alone, but that other officers had also been dispatched, with some officers arriving before the detective and some after. Detective Hall stated that he was dispatched to investigate, that is, to speak to any witnesses and to process the scene for evidence. Detective Hall testified that the incident was first considered just to be a shooting, and that the Residence was not initially considered a crime scene.

Detective Hall stated that when he first arrived, officers had the rear portion of the house cordoned off. Detective Hall testified that, upon arriving, he was informed that a female adult had been shot. Detective Hall stated that an officer escorted him through the Residence to the deceased, at which point Detective Hall called Agent Muhonen of the Tennessee Bureau of Investigation ("TBI"). Detective Hall testified that while looking at the deceased, he noticed the gun on the bed. Detective Hall stated that he could not tell where in the room the individual had been shot. Detective Hall testified that there were no civilians in the deceased's vicinity, but that there were some civilians, specifically Defendant's mother and some children, in the front of the

Residence. Detective Hall stated that he did not recall seeing Defendant when the detective first arrived at the Residence.

Detective Hall testified that the Sheriff, the Chief Deputy, and Detective Mike Owenby had followed Detective Hall into the Residence when he first entered. Detective Hall stated that Agent Muhonen arrived at the Residence before the detective started examining the area around the deceased for evidence. Detective Hall stated that he and the other officers went back outside when Agent Muhonen arrived, and at that point Detective Hall was informed that Defendant was sitting in the back of a patrol car, the doors of which were open. Detective Hall testified that he and Agent Muhonen then discussed whether they should obtain a search warrant, and whether Defendant's consent would be sufficient. Detective Hall stated that he believed that there were some officers in the front of the house with the children and Defendant's mother, but that at that point there were no officers with the deceased, nor were there any officers searching the Residence. Detective Hall testified that Agent Muhonen then called the district attorney to determine how to proceed, and that Agent Muhonen then asked Hall to ask Defendant for consent to search. Detective Hall stated that at this point he was only investigating the shooting, nothing else.

Detective Hall testified that when he approached Defendant to request consent to search the Residence, Defendant was sitting in the back of a patrol car, but the patrol car's doors were open and Defendant was not handcuffed. Detective Hall stated that he knelt in the back of the patrol car, read Defendant his Miranda rights, and asked Defendant to provide consent to search the Residence. Detective Hall testified that Defendant indicated that he understood his rights and that Defendant did not ask for an attorney. Detective Hall stated that Defendant was not under arrest, and that the officers were just using the patrol car as a place where Defendant could sit and wait.

Detective Hall testified that Defendant was free to leave the patrol car at any time.

Detective Hall stated that he asked multiple times whether Defendant would provide consent to search the Residence, but that Defendant did not answer. Detective Hall testified that Defendant then said that he was feeling sick and asked if he could exit the patrol car. Detective Hall stated that Defendant exited the car and asked when his wife's body would be removed. Detective Hall testified that he told Defendant that they could not remove the body until Defendant consented to a search or they obtained a search warrant, at which point Defendant signed the consent to search form. Detective Hall stated that he then asked Defendant if the officers would find any other weapons, to which Defendant replied that there was a shotgun in the Residence and an AK-47 in the trunk of one of the vehicles at the Residence. At this point, Exhibit Four, a consent form signed by Defendant, and Exhibit Five, a report created by Detective Hall and dated August 21, 2007, regarding the events on the morning of August 18, 2007, were entered into evidence.

With regard to Exhibit Four, Detective Hall stated that Defendant initialed the added language at the bottom of the form approving the search of any outbuildings and vehicles on the property. Detective Hall testified that, based upon previous experience with Defendant, Detective Hall knew there was an outbuilding in the woods behind the Residence, so he wanted to account for that in the consent form. Detective Hall stated that he did not explain why he had added the language as to the vehicles and outbuildings, but that Defendant did not object to the additions. Detective Hall reiterated that they were only investigating the shooting and that they had no authority to investigate anything other than the shooting.

Detective Hall stated that he performed a gunshot residue test on Defendant. Detective Hall further stated that he took samples of blood found on Defendant's leg and sent those

to the lab to be tested. With regard to Exhibit Five, Detective Hall testified that he created the report on August 21, 2007, after the events in question.

Detective Hall testified that after he received consent, he went back into the Residence to collect evidence, including a handgun, spent shell casing, and blood samples, and to photograph the area. Detective Hall stated that he did not search for the shotgun Defendant had indicated was in the Residence. Detective Hall testified that no federal agents were searching the Residence at that time. Detective Hall stated that none of the federal agents were inside the Residence at that time.

Detective Hall testified that there was no talk at the scene of this being a murder investigation. Detective Hall stated that there were Tennessee Highway Patrol officers at the scene, but that those officers did not, in Detective Hall's presence, accuse Defendant of murdering his wife. Detective Hall stated that, after providing consent, Defendant asked to be taken from the scene. Detective Hall testified that Defendant was taken to a nearby annex building of the RCSD, and that a federal agent also went to the annex to speak with Defendant.

Detective Hall testified that he left the Residence sometime between 4:00 p.m. and 4:30 p.m. Detective Hall stated that the knew that a federal search warrant was being sought. Detective Hall testified that he told Agent Herndon about the guns he had been told about, so Agent Herndon was attempting to get a search warrant. Detective Hall stated that he did not see any federal agents searching before obtaining a search warrant.

Detective Hall testified that he heard someone other than Defendant state that a four wheeler on the Residence had been used to dispose of a crack pipe, and that was why the four wheeler had been moved sometime in the early morning hours.

On cross examination, Detective Hall stated that he did not see the Surveillance Log, that day, but did see it later. The Surveillance Log was later admitted into evidence as Exhibit Nine. Detective Hall testified that another officer was handling the Surveillance Log. Detective Hall stated that there were several officers on the scene, including members of the Tennessee Highway Patrol and the RCSD, but that no Roane County officers were present.

Detective Hall testified that the 911 dispatcher only indicated to him that there had been a shooting, but did not indicate who had reported the shooting, nor that it involved a husband and wife. Detective Hall stated that when he arrived, there was one officer in the front of the Residence with the children and Defendant's mother, but that there were no officers in the back of the residence with the deceased. Detective Hall testified that he did not know if any other officers had been in the back room with the deceased before Detective Hall arrived. Detective hall stated that he believed that the first patrol officer to arrive on the scene probably went into the back room, as did the EMTs when they responded to the 911 call, but that they were not in the back room when Detective Hall arrived.

Detective Hall stated that if the Surveillance Log indicated that he arrived at 8:46 a.m., that was a fair assessment. Detective Hall indicated that the car Defendant was sitting in the back of belonged to Deputy Brad Harrison. Detective Hall testified that he called Agent Muhonen because there was a possible homicide. Detective Hall stated that after viewing the scene, he was concerned about what had transpired, so he contacted Agent Muhonen. Detective Hall testified that he did not speak with Defendant before Agent Muhonen arrived. Detective Hall stated that he did not search any of the vehicles at the Residence.

Detective Hall testified that after Agent Muhonen arrived, they decided to ask

Defendant for consent to search. Detective Hall stated that Agent Muhonen was not with the detective when he asked Defendant for consent. Detective Hall testified that Deputy Harrison was nearby, on the other side of the patrol car, when the detective asked Defendant for consent, but not right there with the detective and Defendant. Detective Hall stated that the RCSD uses a form document Consent to Search, and that the form does not contain Miranda rights. Detective Hall testified that the RCSD does have a statement form that includes Miranda rights, but further testified that he was not taking Defendant's statement at the time, so he did not use that form. Detective Hall stated that he had considered the possibility that a homicide had occurred by that point in time, and that he would eventually want to question Defendant, but was not ready to question him at that time.

Detective Hall stated that he asked Defendant about consent multiple times with no response before obtaining consent. Detective Hall testified that Defendant did appear to be upset. Detective Hall stated that Defendant said that he was sick or was going to be sick. Detective Hall testified that Defendant informed the detective that Defendant had taken hydrocodone and smoked crack the night before, but that no one had mentioned whether Defendant had taken any pills that morning. Detective Hall stated that Defendant was outside the patrol cruiser when he signed the consent form. Detective Hall testified that he did not attempt to obtain a search warrant before asking for consent.

Detective Hall agreed that Defendant was asking law enforcement officers to come to the Residence when he contacted 911. Detective Hall stated that he had already investigated the room where the deceased was located before obtaining consent. Detective Hall agreed that it was only after Defendant was told that they could not remove the body until they obtained consent or a search warrant that Defendant consented to the search.

Detective Hall stated that he knew outbuilding in the woods behind the Residence had a false bottom, because he had been in the outbuilding before, but that he had not previously found any illegal items in the outbuilding. Detective Hall testified that he knew there were vehicles on the premises because he could see them. Detective Hall stated that he was concerned about the fresh four wheeler tracks leading into the woods, because he wanted to know if anything had been carried off into the woods. Detective Hall testified that he did not remember any mention of a dog having been put up, but that there was a dog at the Residence and that the dog was chained up.

Detective Hall testified that when he left the Residence, federal agents were present, but that he had not seen anyone arrive with a search warrant. Detective Hall stated that he did not remember any officers on the scene discussing a murder investigation, but that it would not be unusual. Detective Hall testified that by the time he arrived at the Residence, Defendant was sitting in the back of the patrol cruiser, but that he was not certain. Detective Hall stated that he had been on the scene for some time before speaking with Defendant, and that it was well after any attempts at medical care were made for the deceased. Detective Hall stated that he did not recall any discussion of whether Defendant needed a lawyer. Detective Hall testified that he did not remember Defendant asking for a lawyer, but that he may have used the word lawyer.

Detective Hall stated that the report marked as Exhibit Five was prepared after the event. Detective Hall stated that the report indicates that he obtained consent at 9:30 a.m., but that that time could be wrong, because the detective did not obtain consent until after Agent Muhonen arrived.

**B.**     **Testimony of Luke Muhonen**

The government next called Luke Muhonen ("Agent Muhonen"), a Special Agent

with the TBI. Agent Muhonen testified that he had been with the TBI for approximately seven years and that he was currently the Criminal Investigations Division Field Agent for Hamilton and Rhea County. Agent Muhonen testified that he had met Defendant two or three months earlier while doing a background check of a state trooper applicant who lived next door to Defendant, but that he had not gone into the Residence at that time, instead speaking to Defendant outside.

Agent Muhonen stated that on August 18, 2007, he was notified to come on duty and respond to a shooting at the Residence. Agent Muhonen stated that he arrived at the Residence at approximately 10:46 a.m. Agent Muhonen testified that when he arrived, Detective Hall advised him as to what had occurred and then they went into the Residence to look at the scene. Agent Muhonen stated that the time noted on the Surveillance Log, 10:49 a.m., reflected when the Agent crossed the cordoned off area around the Residence, not when he actually first arrived at the scene.

Agent Muhonen testified that the deceased was located in a sun room, which he described as a wide open area with a bed and a sofa. Agent Muhonen stated that the deceased was located at the foot of the bed in a pool of blood. Agent Muhonen testified that he believed that some members of the RCSD were present in the Residence, but that Detective Mynatt did not arrive until sometime after Agent Muhonen.

Agent Muhonen stated that he believed that Detective Hall and he first viewed the scene, and then went back outside to advise the Rhea County Attorney General of what had transpired and to ask whether they should obtain a search warrant. Agent Muhonen testified that there was no discussion of a drug investigation at this point, they were just investigating the shooting. Agent Muhonen stated that he did suspect there was some sort of criminal activity going on, but he did not know what at that time. Agent Muhonen testified that he later learned that

Defendant was the subject of a drug investigation.

Agent Muhonen stated that he met Agent Herndon for the first time that day. Agent Muhonen testified that he informed Agent Herndon that Defendant's consent was just in relation to the shooting investigation, not to investigate drugs. Agent Muhonen stated that he did not want to become part of a federal investigation. Agent Muhonen testified that neither Agent Herndon nor Detective Mynatt conducted a search at that time.

Agent Muhonen stated that he was at the Residence when Detective Hall received consent to search and that he knew that Detective Hall had obtained consent. Agent Muhonen testified that, after Defendant consented to the search, while others were preparing to process the scene, Agent Muhonen spoke with Defendant. Agent Muhonen stated that Defendant was upset and wanted to leave, so they took him to a nearby RCSD's Annex for an interview. Agent Muhonen testified that they did not force Defendant to go there, that they only took him there because Defendant wanted to get away from the Residence.

Agent Muhonen stated that he interviewed Defendant at the Annex. Agent Muhonen testified that the shooting was questionable, and since Defendant had been transported to the Annex in a patrol car, the agent decided to Mirandize Defendant and asked him to execute a waiver. The waiver of rights executed by Defendant was admitted into evidence as Exhibit Six. Agent Muhonen stated that Defendant understood his rights, waived them, and then gave his statement. Agent Muhonen testified that he hand wrote the statement for Defendant, but had Defendant initial each paragraph, as well as any changes or edits. The hand written statement was admitted into evidence as Exhibit Seven. A typed copy of the hand written statement was admitted into evidence as Exhibit Eight. Agent Muhonen stated that the last sentence of the statement indicated that some time that

morning Defendant, carrying a bag of drugs, drove the four wheeler into the backyard of the Residence to dispose of the drugs, but that he did not remember where he had placed them.

Agent Muhonen testified that after the interview, he returned to the Residence and spoke with Detectives Hall and Mynatt. Agent Muhonen stated that he believed that the shooting investigation had been completed by the time he returned. Agent Muhonen testified that Defendant stayed at the Annex. Agent Muhonen stated that he believed the government was going to detain or arrest Defendant on narcotics charges. Agent Muhonen testified that he was not comfortable charging Defendant with the shooting at that time, but that Defendant was later charged with the shooting. Agent Muhonen stated that since he believed the federal charges were coming, he felt that he could take the time to wait for the medical examiners report before charging Defendant with murder. Agent Muhonen testified that he told Detective Mynatt about Defendant's statement about the bag of drugs. Agent Muhonen stated that he finished the statement at about 2:15 p.m., so it would have been sometime after that. Agent Muhonen testified that other than Detective Mynatt and Agent Herndon, he did not see any other federal agents at the Residence.

On cross examination, Agent Muhonen testified that he had been contacted by Detective Hall that morning before Agent Muhonen set out for the Residence. Agent Muhonen stated that he and Detective Hall work all questionable shootings together. Agent Muhonen testified that if a shooting is an obvious suicide, that he might not be called, but that the TBI represents an additional investigative resource, so that is why they are called in. Agent Muhonen stated that he could not remember if he was called again while en route to the Residence.

Agent Muhonen testified that he did not recall any officers speaking to Defendant when Agent Muhonen arrived. Agent Muhonen stated that Defendant asked for an "oxy" or a

"hydro," but that Agent Muhonen did not remember Defendant saying at that time that he had recently taken drugs. Agent Muhonen testified that he did not remember if Defendant asked for a lawyer, but further testified that he would not have interviewed Defendant if Defendant has asked for a lawyer. Agent Muhonen stated that initially he was only informed that there had been a questionable death, that he did not initially know whether any charges would be brought.

Agent Muhonen testified that he arrived at the Annex approximately five to ten minutes after Defendant. Agent Muhonen stated that no one else was present during the interview. Agent Muhonen testified that he did not recall who initially brought the four wheeler to his attention. Agent Muhonen stated that he remembered seeing fresh tracks, which indicated that the four wheeler had been moved recently, and that was why he asked about it during the interview.

Agent Muhonen testified that Defendant was asleep when Agent Muhonen arrived at the Annex, and that, during the course of the interview, Defendant would occasionally doze off while the Agent was writing out the statement. Agent Muhonen stated that during the interview Defendant also was sobbing at times, but appeared fine at other times.

Agent Muhonen testified that he finished the interview at the time indicted on the statement. Agent Muhonen stated that he returned to the Residence after the interview to speak with Detective Hall and to determine the results of the investigation. Agent Muhonen testified that he did not stay at the Residence very long after the interview, because he already had plans for that evening. Agent Muhonen stated that he was not sure what time he left the Residence that afternoon, but that Detective Mynatt was standing by the road, waiting for the federal investigation to begin.

**C.**     **Testimony of Jackie Herndon**

The government next called Jackie Herndon ("Agent Herndon"), a Special Agent

with the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Agent Herndon testified that she had

been with the ATF, in the Knoxville office, for approximately eighteen years. Agent Herndon stated

that she was at home on the morning of August 18, 2007, when she received a call from Detective

Mynatt who told her that there had been a fatal shooting at the Residence. Agent Herndon testified

that she had been involved in an investigation of the Outlaws Motorcycle Club and that Defendant

was being investigated as part of that. Agent Herndon stated that her involvement was limited to

the investigation of firearms, but that a narcotics investigation was also ongoing.

Agent Herndon testified that when she received Detective Mynatt's call, they

discussed the events, and then she decided it would be best to proceed to the Residence. Agent

Herndon stated that she met Detective Mynatt at his office, where they contacted the Assistant

United States Attorney ("AUSA") assigned to the case to advise the AUSA as to what had

transpired, and that Agent Herndon and Detective Mynatt then proceeded to the Residence.

Agent Herndon testified that, upon arriving, she noticed that several officers were

already on the scene. Agent Herndon stated that she believed that she received the initial call at

around 7:30 a.m. that morning, and that they did not arrive at the Residence until around 11:00 a.m.

Agent Herndon testified that there was police tape around the Residence, as well as several police

officers and patrol vehicles, and that Defendant was sitting in the back of a vehicle chatting with

officers. Agent Herndon was then shown Exhibit Nine, the Surveillance Log, which indicated a time

of 10:50 a.m. for the agent. Agent Herndon stated that the time on Exhibit Nine was indicative of

when she signed in with the officer keeping the Surveillance Log, but that she would have arrived

at the Residence a few minutes earlier, probably at around 10:40 a.m.

Agent Herndon testified that she decided not to enter the Residence at that time, but rather just stayed outside to speak to the other officers or to the AUSA on the phone. Agent Herndon stated that many of the officers present at the Residence were unaware of the ongoing federal investigation, and that, other than herself and Detective Mynatt, no one else present was involved in the federal investigation. Agent Herndon testified that she had previously obtained evidence of drug and firearm related activity at the Residence. Agent Herndon stated that she received some information from the officers present about narcotics and guns, such as that there was a weapon in the trunk of one of the vehicles at the Residence, and that Defendant had said that he had driven the four wheeler to dispose of a crack pipe.

Agent Herndon testified that she knew there was a chance that narcotics were present in the Residence, and that one of the reasons she had decided to come to the Residence was so that she would know if she needed to obtain a search warrant in furtherance of the federal investigation. Agent Herndon stated that everyone decided that Defendant's consent applied only to the investigation of the shooting by the TBI and the local authorities, and that any federal search would need a warrant. Agent Herndon testified that once that was decided, she left the Residence to return to Knoxville and obtain a search warrant. Agent Herndon stated that even though Defendant had given consent, she wanted to be safe and get a search warrant, as the federal search would involve the entire Residence, not just the area around the deceased.

Agent Herndon stated that Defendant had said that he and his wife had been taking drugs, that his wife then said that she was going to commit suicide, and that she then shot herself. Agent Herndon testified that Defendant had also said that there were weapons in a vehicle at the Residence. At this point, the federal search warrant (the "Warrant") and supporting affidavit were

entered into evidence under seal as Exhibit Three. Agent Herndon stated that the Warrant was signed by the Honorable C. Clifford Shirley, Jr., United States Magistrate Judge, on August 18, 2007, at 3:27 p.m.[2]

Agent Herndon testified that she believed that Detective Mynatt remained at the Residence while she obtained the Warrant. Agent Herndon stated that she thought she was originally at the Residence for about an hour that morning before leaving to draft the search warrant affidavit. Agent Herndon testified that neither she nor Detective Mynatt searched the Residence before obtaining the Warrant. Agent Herndon stated that while driving back to Knoxville to obtain the Warrant, she contacted her supervisor to arrange to have agents on standby to execute a warrant if she did obtain one. Agent Herndon testified that she did not know whether Detective Mynatt went into the Residence, or if he just crossed the police tape, but remained outside.

On cross examination, Agent Herndon stated that she had been working with Detective Mynatt, and that he contacted her that morning because of the ongoing federal investigation. Agent Herndon testified that Steve Paris made a video during the execution of the Warrant, and that the video tape was broken and needed to be repaired, but would be made available to Defendant once it had been repaired. Agent Herndon stated that once she had obtained the Warrant, she notified her agents who were on their way to the Residence, then she drove from Knoxville to the Residence. Agent Herndon testified that it took her approximately thirty to forty minutes to drive to the Residence.

---

[2]The Court notes that Exhibit Three indicates that the application in support of the search warrant was executed by Judge Shirley at 3:27 p.m., but the actual search warrant was executed by Judge Shirley at 3:29 p.m.

Agent Herndon stated that all of the evidence was obtained after she arrived at the Residence with the Warrant. Agent Herndon testified that once she arrived with the Warrant, the agents staged, she briefed them, and then they got to work. Agent Herndon stated that she did not know how exactly how long it took for her to arrive, but that she got there as quickly as she could. Agent Herndon testified that the execution of the Warrant did not begin until she arrived, and that the vehicles were the first things they searched. Agent Herndon stated that Detective Mynatt was there for the execution of the Warrant.

Agent Herndon testified that a container of pills was located in the trunk of a vehicle, possibly a Cavalier, behind the Residence. Agent Herndon stated that she believed that some cell phones were retrieved from the kitchen of the Residence, but that she did not recall any of the local officers handing over any cell phones that they might have obtained during the local investigation. Agent Herndon testified that she did not recall a crack pipe being recovered, nor a bag of drugs in the backyard. Agent Herndon stated that she hopes that they would have found those items if they had been there, because they did search the backyard. Agent Herndon testified that she did not recall which officer advised her of the crack pipe and firearms, and that she does not know all the Rhea County officers by name. Agent Herndon stated that she believed Defendant stated that there was at least one firearm in the Residence.

**D.      Testimony of Kris Mynatt**

The government next called Kris Mynatt ("Detective Mynatt"), a detective with the Roane County Sheriff's Department. Detective Mynatt testified that he had been a detective with the Roane County Sheriff's Department for approximately one year. Detective Mynatt stated that prior to coming to the Roane County Sheriff's Department, he had previously worked with the

Harriman Police Department for approximately four and a half years, had worked with the TBI prior to that, as well as a prior period of service with the Harriman Police Department before his term with the TBI.

Detective Mynatt testified that he was investigating Defendant and learned of the federal investigation, so he joined in that investigation. Detective Mynatt stated that on the morning of August 18, 2007, he was contacted by a TBI agent about the shooting, at which point Detective Mynatt contacted Agent Herndon. Detective Mynatt testified that he and Agent Herndon decided to go to the Residence in case they needed to act on their investigation. Detective Mynatt stated that prior to the shooting, Mrs. Hampton had provided information to the federal investigators, but that she had returned to working with Defendant afterwards. Detective Mynatt testified that it was clear from the wiretaps that she was involved and was a suspect.

Detective Mynatt stated that he met Agent Herndon at Detective Mynatt's office and that they then proceeded to the Residence. Detective Mynatt testified that he did not know who had crossed out the text "not been in house" on Exhibit 9 next to Detective Mynatt's name, but that he assumed it was the officer keeping the log. Detective Mynatt stated that he did enter the Residence, but that he only stood in the corner of the room where the shooting took place and observed while the local officers conducted their investigation. Detective Mynatt testified that he did not assist the local officers, nor offer advice, nor conduct his own search, but only watched from the corner.

Detective Mynatt stated that when Agent Herndon left to obtain the Warrant, he remained at the Residence. Detective Mynatt testified that he did not conduct any sort of search, and that no other federal agents searched the Residence before Agent Herndon returned with the Warrant. Detective Mynatt stated that he did assist in the execution of the Warrant once Agent

Herndon returned.

On cross examination, Detective Mynatt testified that he had investigated Defendant before when Defendant lived in Roane County. Detective Mynatt stated that he conducted controlled purchases in 2005 from homes believed to belong to Defendant. Detective Mynatt testified that he approached Mrs. Hampton about cooperating with the investigation when she was separated from Defendant in 2006.

Detective Mynatt stated he didn't recover any evidence from the Residence or obtain any cell phones until after Agent Herndon returned with the Warrant. Detective Mynatt testified that he doesn't recall when the photos were taken. Detective Mynatt stated that the vehicles at the Residence were the last things seized during the execution of the Warrant. Detective Mynatt testified that he did not believe he had his seizure paperwork with him while he was watching the local investigation, so he doesn't think that he started working on the paperwork before the Warrant was obtained. Detective Mynatt stated that he did not find a crack pipe or a bag of drugs in the backyard, only the bucket of drugs in one of the vehicles.

## E.    Affidavit of Daniel Glen Hampton

Defendant did not testify at the hearing. However, Defendant did file an affidavit which was received into evidence as Exhibit Twelve. The affidavit asserts that shortly after the first officers arrived at the Residence on August 18, 2007, Defendant requested an attorney. The identity of the person(s) to whom this request was made is not stated. In the affidavit, Defendant also states, "I was not read any of my rights."

At the close of the hearing, two affidavits in support of wiretap applications were received into evidence under seal as Exhibits One and Two. Additionally, after the hearing, the

applications for wiretaps associated with Exhibits One and Two were received into evidence under seal as Exhibits Ten and Eleven.

## II.  FINDINGS OF FACT

The Court finds that on August 18, 2007, at approximately 7:30 a.m., a Rhea County 911 operator received a call reporting a shooting at the Residence.  By 7:40 a.m., multiple officers and paramedics had arrived at the Residence.  At approximately 7:55 a.m., Defendant sat in the back of a patrol car, but the doors were left open and Defendant was not under arrest or otherwise detained.  Sometime after the 911 call, Detective Hall was directed to report to the Residence to investigate a possible shooting.  Detective Hall arrived at the Residence at approximately 8:46 a.m.  At that point in time, one law enforcement officer was in the front of the Residence with some children and Defendant's mother, but there were no other officers in the house, though law enforcement and paramedics had entered the sun room during the initial response to the 911 call.  Upon arriving, Detective Hall and other law enforcement officers entered the Residence and proceeded to the sun room in the rear of the Residence, where the deceased, Mrs. Hampton, was located.

Upon entering the sun room, Detective Hall noticed the deceased was lying at the foot of a bed in a pool of blood, and that a handgun was lying on the bed.  Detective Hall then called Agent Muhonen to assist in the investigation.  Additionally, sometime after the shooting was reported to 911, Detective Mynatt received a phone call advising him of the shooting.  Detective Mynatt then called Agent Herndon, and the two decided to meet at Detective Mynatt's office so that they could be on hand in the event that they needed to act in furtherance of the ongoing federal investigation involving Defendant.  Once Agent Herndon arrived at Detective Mynatt's office, she

contacted the AUSA assigned to the case, and then Agent Herndon and Detective Mynatt proceeded to the Residence.

At approximately 10:46 a.m. Agent Muhonen arrived at the Residence, but he was not logged in on the Surveillance Log until 10:49 a.m. At around that same time, Agent Herndon and Detective Mynatt arrived, both of whom were logged in on the Surveillance Log at 10:50 a.m. When Agent Muhonen arrived, Detective Hall and Agent Muhonen entered the Residence and proceeded to the sun room. At that point in time, the only other law enforcement officers in the Residence were in the front of the Residence with the children and Defendant's mother. After viewing the deceased, Detective Hall and Agent Muhonen exited the Residence and Agent Muhonen called the Rhea County Attorney General, who advised the officers that they should ask Defendant if he would consent to a search in furtherance of the shooting investigation.

Detective Hall then walked over to the patrol car where Defendant was sitting, knelt in the back of the patrol car and read Defendant his Miranda rights. Defendant indicated that he understood his rights and did not request an attorney. Defendant was not under arrest at this time, and though he was sitting in the back of a patrol car, the doors of the car were open, Defendant was not handcuffed, and he was free to leave the car at any time. After reading Defendant his rights, Detective Hall asked Defendant if Defendant would consent to a search of the residence. Defendant did not respond, so Detective Hall again asked if Defendant would consent. Detective Hall asked Defendant several times if Defendant would consent, but Defendant did not respond. Defendant next asked if he could exit the car, because he was feeling sick. Defendant exited the car and stood outside the vehicle.

While outside the vehicle, Defendant asked Detective Hall when the officers were going to remove his wife's body. Detective Hall informed Defendant that they could not remove the body until they obtained either his consent to search or a search warrant. Defendant then stated that he would consent to the search and signed the consent form. [Exhibit 4] Defendant also initialed the handwritten language at the bottom of the consent form. [Id.] After Defendant signed the consent form, Detective Hall asked Defendant if the officers would find any weapons in the Residence. Defendant advised the detective that there was a shotgun in the house and an AK-47 in the trunk of one of the vehicles at the Residence.

After obtaining Defendant's consent, Detective Hall entered the Residence, took photographs, and collected evidence, including one handgun, a spent shell casing, and blood evidence from inside. Detective Hall also performed a gunshot residue test on Defendant and took a blood sample from blood on Defendant's leg. Detective Hall did not search for the shotgun Defendant had described to the detective.

After Detective Hall obtained consent, it was decided that the consent only applied to the investigation of the shooting, not to the ongoing federal investigation. No federal investigators took part in the local investigation, and no evidence for the federal investigation was seized during the local investigation. Detective Hall told Agent Herndon about Defendant's statement concerning guns. At some point, Defendant advised officers that he had driven a four wheeler earlier that morning in order to dispose of a crack pipe. Agent Herndon was also advised of Defendant's statement concerning the crack pipe. After it was decided that the consent only applied to the local investigation, Agent Herndon returned to Knoxville to obtain a federal search warrant.

At approximately 12:00 p.m., Defendant asked to be taken from the scene, so he was transported to a nearby RCSD Annex. Defendant was transported in the back of a patrol car, but he was not under arrest at that time and the transport was voluntary. Agent Muhonen also traveled to the Annex, arriving approximately five to ten minutes after Defendant. Once at the Annex, Agent Muhonen Mirandized Defendant and asked him to sign a waiver of rights, which Defendant executed at 12:22 p.m. [Exhibit 6] Agent Muhonen then took Defendant's statement, with the agent hand writing the statement and Defendant initialing every paragraph of the statement, as well as any changes to the statement. [Exhibit 7] The statement was completed at 2:15 p.m. At no time prior to this did Defendant request an attorney.

While Defendant was making his statement, Agent Herndon returned to Knoxville and prepared an application for a search warrant. While returning to Knoxville, Agent Herndon arranged to have agents on standby to execute a warrant, should she obtain one. The Warrant was issued sometime between 3:27 p.m. and 3:29 p.m. [Exhibit 3] After the Warrant was issued, Agent Herndon returned to the Residence with the Warrant.

While Agent Herndon was obtaining the Warrant, Detective Mynatt had remained at the Residence, observing. Agent Mynatt did enter the Residence, but he did not assist in the shooting investigation in any manner, nor did he seize any evidence before Agent Herndon returned with the Warrant. Instead, Agent Mynatt stood in the corner of the sunroom as county officers processed the scene. Detective Hall and Agent Muhonen both left the Residence before Agent Herndon returned with the warrant.

Agent Herndon arrived at the Residence with the Warrant at approximately 4:00 p.m. Once Agent Herndon arrived, she briefed her team, and then they executed the Warrant. Detective

Mynatt assisted in the execution of the Warrant. No evidence obtained under the Warrant was seized prior to Agent Herndon's arrival at the Residence with the Warrant.

The Court finds the testimony of Agents Herndon and Muhonen and Detectives Hall and Mynatt to have been credible, not impeached by cross examination, nor contradicted by any other testimony. The Court finds that the affidavit provided by Defendant [Exhibit 12] merits little, if any, evidentiary weight, and does not find that the affidavit successfully impeached the testimony of the various officers. The Court notes the discrepancy in times between Detective Hall's report [Exhibit 5] and the other evidence of record, but finds Detective Hall's testimony that the report was created several days after the event, and that the time on the report was in error, to be credible.

### III.     MOTION TO SUPPRESS EVIDENCE, AS AMENDED [Docs. 67, 91]

Defendant contends that the federal agents involved in this matter seized evidence prior to obtaining a warrant, and that the evidence should thus be excluded as the fruits of a warrantless search. Additionally, in his amendment [Doc. 91], Defendant argues that he was not Mirandized at the Residence, and denies having made any statements as to a shotgun and an AK-47. Defendant contends that even if such statements were made, that they were obtained in violation of his Miranda rights and thus should be suppressed. The government opposes the motion, arguing that all evidence was properly obtained and should not be suppressed.

### A.     Statement

The Court will first address Defendant's arguments as to the disputed statement and the alleged absence of Miranda warnings. The Court found above that, based upon the evidence before the Court, Defendant did advise law enforcement of the presence of a shotgun and an AK-47. The Court also found that Defendant was Mirandized before he made these statements.

However, the Court also notes that "Miranda warnings are due only when a suspect interrogated by the police is 'in custody.'" Thompson v. Keohane, 516 U.S. 99, 102 (1995). In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply on whether there was a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994); see also Miranda v. Arizona, 384 U.S. 436, 444 (1966) (defining "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). Thus, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323.

In the instant case, Defendant was initially sitting in the back of a police cruiser when approached by Detective Hall, but Defendant was not under arrest. The doors of the police cruiser were left open, and Defendant was not handcuffed, so he was in no way restrained. Additionally, the record reflects that Defendant exited the patrol car during his conversation with Detective Hall, further evidence of a lack of restraint on Defendant's freedom of movement. Based upon all evidence of record, the Court finds that when Detective Hall approached Defendant to obtain consent to search, Defendant was not "in custody," and thus Miranda warnings were not required. Defendant was free to exit the vehicle and to ignore the police, if he so chose.

Additionally, the Court finds that the police in no way pressured or coerced the consent or statements from Defendant. The police advised Defendant that they would not be able to remove his wife's body until they obtained consent or obtained a search warrant. They did not

state that they would only remove the body if Defendant consented, so Defendant could have chosen to withhold his consent, just as Defendant could have chosen to disregard the question as to whether there were any firearms in the Residence. However, given that Defendant had been informed of his rights, the Court finds that the Defendant intelligently, knowingly, and freely waived his rights by providing consent and by answering the question posed to him.

With regard to the statements made by Defendant at the Annex, the Court finds that Defendant signed a waiver of rights [Exhibit 6] and that this waiver was also intelligent, knowing, and voluntary. Accordingly, the Court finds no basis for suppressing any of the statements made by Defendant.

## B.    Warrantless Search

Defendant also argues that federal agents seized evidence in this matter in the absence of a valid search warrant. However, there is absolutely no evidence that would indicate that any of the evidence obtained was seized prior to Agent Herndon's return. Rather, all of the testimony reflects that the federal search did not begin until Agent Herndon returned. Accordingly, the Court finds that all of the evidence was obtained pursuant to the Warrant and should not be suppressed. Defendant also attacks the validity of the Warrant, arguing that its reliance on the improper wiretaps invalidates the Warrant. The Court addresses those arguments below.

## III.    MOTION TO SUPPRESS FRUITS OF WIRETAPS [Doc. 61]

Defendant contends that the government failed to meet the necessity requirement established by 18 U.S.C. § 2518. Specifically, Defendant argues that the government has not shown that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Defendant contends

that the government utilized a number of cooperating witnesses in this matter, and that because of all of the information obtained from these cooperating witnesses, the government cannot show that other investigative techniques have failed or would be unlikely to succeed. Additionally, in his post hearing brief [Doc. 112], Defendant argues that a hearing is needed on the instant motion to determine whether the government failed to properly inform the District Judge of all of the facts relevant to the wiretap. The government opposes the motion, arguing that the wiretaps were proper and that the District Judge was advised of all relevant information.

During the February 7, 2008, hearing, the Court determined that it could resolve the instant motion based upon the briefs and the underlying wiretap applications and affidavits. Defendant was given leave to file a supplemental brief addressing whether an evidentiary hearing on the wiretap issue was needed. [Doc. 107] Having reviewed Defendant's supplemental brief and exhibit [Docs. 112, 113] and the government's response [Doc. 114], the Court again finds that an evidentiary hearing is not needed as to the wiretap issue. Accordingly, the Court will rule on the instant motion based upon the filings and evidence of record.

Federal law establishes the following procedure with respect to an application for a wiretap:

> (1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>
>   (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;
>
>   (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should

be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. 2518(1). In interpreting the requirements of 18 U.S.C. 2518(1)(c), the Sixth Circuit has

held that the statute does not "require that the police officials exhaust every conceivable non-wiretap

investigative technique. All that is required is that the investigators give serious consideration to

the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of

the reasons for the investigators' belief that such non-wiretap techniques have been or will likely

be inadequate." United States v. Lambert, 771 F.2d 83, 91 (6th Cir. 1985).

In the instant case, the affidavits in support of the wiretaps at issue each provide an extensive description of what techniques have been tried, as well as a description of why other, untried techniques would not be successful. [Exhibit 2 at pp 52-58; Exhibit 3 at pp. 75-81] These descriptions are specifically tailored to the case at hand and the Court does not find them to consist of the boilerplate language warned against by other courts. See United States v. Leavis, 853 F.2d 215, 221 (4th Cir. 1988) ("mere 'boilerplate recitation of the difficulties of gathering useable evidence'" are insufficient to satisfy the necessity requirement, specific factual information is needed). Rather, the descriptions address the security measures used by the suspects to avoid detection, the fact that the rural, and close knit, nature of the community in which the suspects reside hampers the use of more traditional surveillance techniques, the use of intimidation by the suspects under surveillance to discourage witnesses from cooperating with the government, and other persuasive reasons why wiretaps were needed. Having reviewed the wiretap applications, as well as all other evidence of record, the Court finds that the government did provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," as required by federal law, and thus did meet the necessity requirement of 18 U.S.C. 2518(1)(c).

Additionally, Defendant argues in his supplement that a subsequent application for a state search warrant stated that a confidential source had revealed information about potential sources of supply for Defendant. Defendant contends that this information was not disclosed to the District Judge, and that if it had, it would have shown that traditional investigative techniques were proving successful and that a wiretap would not have been necessary. In response, the government

contends that the confidential source at issue in the state search warrant application consisted of the conversations obtained through the use of the court ordered wiretap, and that the state judge was advised of the "identity" of this confidential source. [Doc. 113 at § 6] The government also argues that while confidential sources were used in this matter, wiretaps were necessary to ascertain the full extent of the drug network under investigation, especially in light of the fact that Defendant utilized multiple sources of supply. [Exhibit 1 at ¶ 23]

The Court notes that the state search warrant affidavit is dated August 28, 2007. [Doc. 113] However, the wiretap applications at issue are dated May 17, 2007, and June 15, 2007. Given that the June 15, 2007, wiretap authorization expired thirty days later on July 15, 2007, approximately a month and a half before the state search warrant application, and given that the confidential source at issue was not an actual person, but simply the information obtained through the wiretap, the Court does not find that the government improperly withheld information from the District Judge when renewing the wiretap. Additionally, the Court finds that the extensive nature of the drug network under investigation and the inability of the confidential informants available to the government to identify the full extent of that network, provide additional evidence of the government's need to resort to wiretaps in this matter.

Based upon all of the above, the Court finds that the government satisfied the necessity requirement of 18 U.S.C. 2518(1)(c), and thus finds that the evidence obtained through the wiretaps should not be suppressed. Additionally, given that the Court finds no reason to suppress the evidence obtained pursuant to the wiretaps, the Court also finds that the fact that the affidavit in support of the Warrant relied upon information obtained from the wiretaps does not invalidate the Warrant.

## IV.    CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Daniel Glen Hampton's Motion to Suppress Evidence, as amended [Docs. 67, 91] and Motion to Suppress Fruits of Wiretaps [Doc. 61] should be **DENIED**.[3]

Respectfully submitted,


_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[3]  Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  Thomas v. Arn, 474 U.S. 140 (1985).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).